# EXHIBIT B

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**

1

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF NEW YORK

4   BUFFALO DIVISION

5   . . . . . . . . . . . . . . . . . . . . . X

6   THERESA MULLERY,

7                     Plaintiff,

8
                -against-          Docket No.
9                              18C0549-LJV

10   JTM CAPITAL MANAGEMENT, LLC a Delaware limited
     liability company,
11
                     Defendant.
12   . . . . . . . . . . . . . . . . . . . . . X
     AMANDA PERRY,
13
                     Plaintiff,
14

15              -against-          Docket No.
                               18C0566-LJV
16
     JTM CAPITAL MANAGEMENT, LLC a Delaware limited
17   liability company,

18                   Defendant.
     . . . . . . . . . . . . . . . . . . . . . X
19
                     Remote Deposition
20
                     May 20, 2021
21                   10:00 A.M.

22

23

24        (CAPTION CONTINUED ON FOLLOWING PAGE.)

25

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                    **Pages 2..5**

Page 2

1
2          Remote Deposition
3          May 20, 2021
4          10:00 A.M.
5
6     EXAMINATION BEFORE TRIAL of
7        JACOB ADAMO, the Defendant, taken on
8   behalf of the Plaintiff, pursuant to Notice,
9   held before a Notary Public of the State of
10  New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2   A P P E A R A N C E S :
3
4     PHILIPPS & PHILIPPS
5          Attorney for Plaintiff
6          9760 S Roberts Road
7          Palos Hills, Illinois 60465
8     BY: ANGIE ROBERTSON, ESQ.
9          BRIAN BROMBERG, ESQ.
10
11    LIPPES MATHIAS WEXLER FRIEDMAN, LLP
12          Attorney for Defendant
13          50 Fountain Plaza, Suite 1700
14          Buffalo, New York 14202
15    BY: BRENDAN H. LITTLE, ESQ.
16
17
18
19
20
21
22
23
24
25

Page 4

1
2                    INDEX
3
4   EXAMINATION BY                    PAGE
5   MS. ROBERTSON                     9
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2                    EXHIBITS
3
4   PLAINTIFF'S      DESCRIPTION          PAGE
5   Exhibit 1   Notice of deposition      11
6   Exhibit 2   File complaint        32
7   Exhibit 3   Defendant's answer        32
8   Exhibit 4   JTM's discovery responses  32
9   Exhibit 5   Supplemental response    63
10  Exhibit 6   File complaint         72
11  Exhibit 7   Defendant's response      72
12  Exhibit 8   Initial response       80
13  Exhibit 9   Defendant's response      89
14  Exhibit 10  Stipulation          93
15
16  DEFENDANT'S      DESCRIPTION        PAGE
17  (NONE)
18
19
20
21
22
23
24
25

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                                            **Pages 6..9**

Page 6

1
2      INFORMATION/DOCUMENTATION REQUEST INDEX
3      INFORMATION REQUESTED                    PAGE
4      (NONE)
5
6      INFORMATION TO BE INSERTED           PAGE
7      (NONE)
8
9      MARKED FOR RULING                    PAGE
10     (NONE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1
2      The attorneys participating in this deposition
3      acknowledge that I am not physically present
4      in the deposition room and that I will be
5      reporting this deposition remotely. They
6      further acknowledge that, in lieu of an oath
7      administered in person, the witness will
8      verbally declare his/her testimony in this
9      matter under penalty of perjury.  The parties
10     and their counsel consent to this arrangement
11     and waive any objections to this manner of
12     reporting.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1
2         S T I P U L A T I O N S
3
4         IT IS HEREBY STIPULATED AND AGREED
5      by and between the attorneys for the
6      respective parties herein, that filing,
7      sealing and certification be and the
8      same are hereby waived.
9
10        IT IS FURTHER STIPULATED AND AGREED
11     that all objections, except as to the
12     form of the question shall be reserved
13     to the time of the trial.
14
15        IT IS FURTHER STIPULATED AND AGREED
16     that the within deposition may be signed
17     and sworn to before any officer
18     authorized to administer an oath, with
19     the same force and effect as if signed
20     and sworn to before the Court and that a
21     copy of this examination shall be
22     furnished without charge to the attorney
23     representing the witness testifying
24     herein.
25

Page 9

1
2      J A C O B   A D A M O, the witness herein,
3      having first been duly sworn by a Notary
4      Public of the State of New York, was examined
5      and testified as follows:
6      EXAMINATION BY
7      MS. ROBERTSON:
8         Q.  State your name for the record, please.
9         A.  Jacob Adamo.
10        Q.  State your address for the record,
11     please.
12        A.  6400 Sheridan Drive, Suite 138,
13     Williamsville, New York 14221.
14        Q.  Good morning, my name is Angie Robertson
15     I represent the plaintiffs in both of these two
16     matters and I am going to go over a few ground
17     rules.  Before we begin, how many depositions would
18     you say that you have given?
19        A.  Handful.
20        Q.  So less than 20?
21        A.  Yes.
22        Q.  Less than ten?
23        A.  I would say anywhere between 5 and 10.
24        Q.  I'm going to lay the ground rules, I know
25     that you have done this before but I do have a few

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                          Pages 10..13

Page 10

```
1
2   rules.  Please wait until you hear a complete
3   question before you move on to the topic or
4   question.  There are going to be objections so make
5   sure if people are speaking at the same time that
6   people get the opportunity to finish.  When you
7   answer questions and this can be difficult to do
8   please answer with yes or no, try to avoid things
9   like yes, head shakes, do you understand?
10      A.  Yes.
11      Q.  So we can keep a record.  Please wait
12  until you hear my entire question before you answer
13  that way we can get a cleaner record and if I use a
14  phrase or term that you don't understand let me know
15  and I will try to rephrase it.  If you use the word
16  or phrase or acronym that I don't understand I will
17  do the same thing.  Finally, if you need to take a
18  break and I anticipate that we may need a break in
19  this, that's fine, we can take breaks but what I
20  would ask is that we answer any questions that have
21  been asked before we take a break.
22      I believe that covers all of the ground rules
23  that I have, I know that we discussed the timing of
24  this and I believe that we could keep it under four
25  hours.  I do have the right to go longer, are you
```

Page 11

```
1
2   limited to four hours today?
3       A.  I have a part cut off at 2.
4       Q.  Can we agree that if it goes over 2 P.M.
5   that we could continue and do this deposition
6   another day?
7           MR. LITTLE:  Well I am not going to
8       agree to that at this point but let's see
9       how the deposition goes.
10          MS. ROBERTSON:  I will do my best
11      to get through all of it by that time.
12      Q.  I am going to share my screen and show
13  you an exhibit that I am going to mark as exhibit
14  one.
15          (Whereupon, the aforementioned
16      document was marked as Plaintiff's
17      Exhibit 1 for identification as of this
18      date by the Reporter.)
19      Q.  This is the second amended notice of
20  deposition.  Have you seen this before today?
21      A.  Yes.
22      Q.  And when did you see this?
23      A.  Yesterday.
24      Q.  In what context did you see it?
25      A.  Brendan Little e-mailed it to me and I
```

Page 12

```
1
2   reviewed it.
3       Q.  Now are you able to annotate, can you go
4   through this list of topics and put check marks on
5   the topics that you can speak of today?
6       A.  I believe I can speak of most – all the
7   topics here.
8       Q.  If you want I can go through them
9   individually, are there any that you can't speak to?
10      A.  No.
11          MS. ROBERTSON:  The record
12      confirmed that he has agreed that he will
13      speak to all of these topics.
14          MR. LITTLE:  His testimony speaks
15      for itself.
16      Q.  I am going to produce – you said you met
17  with your attorney to discuss these documents?
18      A.  No.
19      Q.  You said he e-mailed it to you?
20      A.  Yes.
21      Q.  What else did you do to prepare for this
22  deposition?
23      A.  I did a lay review of other documents
24  that were provided.
25      Q.  Provided by who?
```

Page 13

```
1
2       A.  My counsel.
3       Q.  What kind of documents?
4       A.  The court documents that we submitted as
5   responses.
6       Q.  Did you review any account notes?
7       A.  The screen shots in the account notes
8   that we provided you.
9       Q.  Did you meet with anyone in person to
10  prepare for this?
11      A.  No.
12      Q.  Did you meet with anyone over the phone
13  to prepare for this?
14      A.  Brendan briefly.
15      Q.  Five minutes, ten minutes, half hour?
16      A.  Five to ten minutes I believe.
17      Q.  You have been designated as a witness
18  under rule 30B6 on behalf of JTM Capital Management,
19  you confirm that JTM has selected you to serve as
20  their witness?
21      A.  Yes.
22      Q.  I am going to ask you some background
23  information about you and your role at JTM, what is
24  your educational background post high school?
25      A.  I have an associates degree.
```

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                    Pages 14..17

Page 14

1
2  Q.  Where is that from?
3  A.  Brian Straton.
4  Q.  What is that in?
5  A.  Business management.
6  Q.  When did you obtain that?
7  A.  2008 I think.
8  Q.  What was your first job after you
9  finished school?
10  A.  I was working during school as a debt
11  collector.
12  Q.  What company?
13  A.  Aurora Gold & Associates.
14  Q.  How long were you there, what years?
15  A.  I don't recall it was a long time ago.
16  Q.  So you received your associates in 2008
17  were you there in 2008?
18  A.  Yes, I was working while I was in school.
19  Q.  And you don't recall how long you worked
20  for them?
21  A.  Probably a year or so.
22  Q.  When did you graduate high school?
23  A.  2006.
24  Q.  Was Aurora Gold & Associates your first
25  full-time job or first job out of high school?

Page 15

1
2  A.  It was not.
3  Q.  What else did you do after you graduated
4  high school?
5  A.  I worked at Tim Hortons, I worked at
6  Tops, you know medial jobs that high school kids
7  work.
8  Q.  Retail?
9  A.  Yes.
10  Q.  So after you get these associates and you
11  are at Aurora Gold & Associates what was your next
12  job?
13  A.  Jacobs Marsh.
14  Q.  What was that?
15  A.  A collection agency -- it was actually a
16  debt buyer sorry.
17  Q.  How long were you there and for how many
18  years?
19  A.  I was there roughly one or two years and
20  what was the other part of the question?
21  Q.  I think I said how long and for what
22  years, when did you start that job?
23  A.  After I left Aurora Gold, again I don't
24  remember exact times.
25  Q.  So sometime between 2008 and 2009?

Page 16

1
2  A.  Probably so, yes.
3  Q.  What was your role there?
4  A.  Started as a collector and then became
5  head of purchasing and started their legal
6  department.
7  Q.  You said you were there for one to two
8  years and you had these different roles during that
9  time?
10  A.  Yes.
11  Q.  How long did you work as a collector
12  there?
13  A.  Debt collector?
14  Q.  Yes.
15  A.  Probably half the time I was there.
16  Q.  So about one year?
17  A.  Give or take, yes.
18  Q.  How long were you in purchasing?
19  A.  The remainder of the time.
20  Q.  But you started the legal department was
21  that something that you did as part of your role in
22  purchasing?
23  A.  Yes, it was in conjunction.
24  Q.  What other roles did you have in your
25  day-to-day?

Page 17

1
2  A.  That's pretty much it.
3  Q.  So as a purchaser what were you
4  purchasing?
5  A.  Receivables.
6  Q.  Can you just in lay terms like you were
7  explaining it a cocktail party what does that
8  mean?
9  A.  I don't explain it at a cocktail party,
10  it's not something that we like to talk about
11  because people look at it in a not so nice way.
12  Q.  If you were explaining it to someone that
13  is interested in doing it, maybe you are speaking to
14  a high school class how would you describe as you do
15  as a purchaser of receivables?
16  A.  We purchase, charge off receivables from
17  banks that's exactly what I would say.
18  Q.  What exactly are you buying?
19  A.  Consumers obligation to settle financial
20  institutions.
21  Q.  So you did this for about one to two
22  years that brings us to roughly 2010, what was your
23  next job?
24  A.  I started Brightwater Capital with a
25  partner.

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                    Pages 18..21

Page 18

```
1
2    Q.  Who is your partner?
3    A.  Donna Mastes.
4    Q.  Can you spell it?
5    A.  I don't know how to spell it, again we
6    parted ways 8 to 9 years ago.
7    Q.  What was Brightwaters Capital?
8    A.  Debt buying company.
9    Q.  So again you are buying receivables?
10   A.  Yes.
11   Q.  And how long did you work for that
12   company?
13   A.  About a year as well actually.
14   Q.  So now we are up to roughly 2011, what
15   was your next position?
16   A.  Consulting work for a handful of
17   companies, I didn't have a full-time position until
18   two years after.
19   Q.  So about one to two years you were doing
20   independent consulting not working for any specific
21   company?
22   A.  Yes.
23   Q.  What type of consulting were you doing?
24   A.  Same thing that I have been doing, debt
25   purchasing, things of that nature.
```

Page 19

```
1
2    Q.  So now we are up to about 2013.
3    A.  Yes.
4    Q.  What job did you start in 2013?
5    A.  JTM Capital Management.
6    Q.  Did you found JTM Capital Management?
7    A.  I did.
8    Q.  Did you have any partners?
9    A.  No.
10   Q.  Did you have any employees at the time?
11   A.  When I first started no.
12   Q.  When did you get employees?
13   A.  Probably 2014.
14   Q.  In lay terms, someone from your community
15   college or someone from a high school in your area
16   to do the same thing as you, what does JTM do?
17   A.  Passive debt buyer.
18   Q.  What do you mean by that?
19   A.  Meaning that JTM doesn't engage in actual
20   collections it subcontracts with providers that do.
21   Q.  So when you say it doesn't engage in
22   collections you mean it doesn't have direct contact
23   with the debtors?
24   A.  Yes.
25   Q.  Or the alleged debtors?
```

Page 20

```
1
2    A.  Yes.
3    Q.  Does JTM do anything else besides that?
4    A.  No.
5    Q.  Does JTM get any other revenue from
6    sources besides the indirect collection involving
7    consumer debts?
8        MR. LITTLE:  Objection to form.
9    A.  Passive investment.
10   Q.  What's passive investments?
11   A.  Investing in contract deals with -- it
12   was a single member LLC so I ran some consulting
13   work through there, it could be things of that
14   nature.
15   Q.  So passive debt collection and also some
16   consulting work?
17   A.  Yes.
18   Q.  So when you founded JTM in 2013 was that
19   your only position?
20   A.  Yes.
21   Q.  And any consulting work that you did you
22   did as JTM?
23   A.  It depends, it's a single member LLC so
24   my contracts would probably be personal but from a
25   tax basis it may have ran through JTM.
```

Page 21

```
1
2    Q.  But not for any other company?
3    A.  No.
4    Q.  Are you still at JTM?
5    A.  Yes.
6    Q.  Is JTM still buying debts?
7    A.  No.
8    Q.  When did JTM stop buying debts?
9    A.  I don't have an exact date, I would
10   probably say sometime in 2019.
11   Q.  Does JTM still outsource collection of
12   debts?
13   A.  No.
14   Q.  What does JTM do now?
15   A.  It's in wind down.
16   Q.  So JTM has been in wind down since 2019?
17   A.  Yes, pretty much.  We weren't actively
18   purchasing after 2019, it may even be sooner than
19   that, again I wasn't prepared for that.
20   Q.  The exact date isn't important.  What has
21   become of JTM assets since its wind down?
22       MR. LITTLE:  Objection to the form,
23   outside the scope of the notice.  His
24   answer does not bind the company, you can
25   answer if you know.
```

## THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC
### Jacob Adamo on 05/20/2021

Pages 22..25

Page 22

1
2   A.  What was the question?  Say that again.
3   Q.  I am asking about the status of the
4   assets now that JTM is in wind down?
5   A.  JTM sold all assets, all remaining assets
6   back in 2020, I believe August.
7   Q.  Sold back to who?
8   MR. LITTLE:  Objection to form,
9   outside the scope of the notice.  He is
10   not going to answer these questions.
11   MS. ROBERTSON:  These two debts we
12   have no proof of where they came from,
13   who owns them and there seems to
14   definitely be involvement of other
15   parties on the account notes.
16   MR. LITTLE:  You can ask about the
17   accounts and the debts at issue but
18   generally JTM assets that's well outside,
19   not even close to anything in this list
20   so you can ask away about the accounts at
21   issue or debts at issue.
22   MS. ROBERTSON:  Okay but JTM and
23   its assets if JTM is the defendant –
24   it's relevant because JTM is going to be
25   at some point if we were to win this case

Page 23

1
2   financially responsible for damages.
3   MR. LITTLE:  Sure and you can do
4   post judgement discovery at some point if
5   you win.
6   Q.  So going back to your role at JTM you
7   mentioned that you believe in around 2019 but you
8   didn't know the for sure dates it went into wind
9   down, between 2013 and 2019 did you hold any other
10   roles for any other companies?
11   A.  Between 2013 and 2019?
12   Q.  Yes, so this would be a 6 year stretch?
13   A.  Yes.
14   Q.  What companies were those?
15   A.  I have a payment processing company that
16   was Szczur Financial.
17   Q.  Can you spell that?
18   A.  S-Z-C-Z-U-R.
19   Q.  That's definitely a mouth full, now you
20   said that was a payment processing company?
21   A.  Yes.
22   Q.  And you started that company?
23   A.  Yes.
24   Q.  What year did you start that in?
25   A.  2014.

Page 24

1
2   Q.  How many employees did that company have?
3   MR. LITTLE:  Objection, this is a
4   deposition about JTM not other companies.
5   You can answer.
6   MR. LITTLE:  I am looking at the
7   notice, there is nothing about this at
8   all.
9   MS. ROBERTSON:  Are you refusing to
10   let him answer the question?
11   MR. LITTLE:  I am instructing him
12   not to answer.
13   Q.  So you mentioned that was in 2014,
14   speaking specifically about debt buyers have you
15   been an officer for any other debt buyers?
16   A.  Yes.
17   Q.  What would that be?
18   THE WITNESS:  Am I answering this?
19   MR. LITTLE:  Yes.
20   A.  United Holding Group.
21   Q.  Does United Holding Group have a relation
22   with JTM?
23   MR. LITTLE:  You can answer that
24   question.
25   A.  I'm not sure how to answer that question,

Page 25

1
2   there is no direct relationship at this point.
3   Q.  Was there ever?
4   A.  UHC used contracts with JTM to work some
5   UHC accounts at some point.
6   Q.  Can you be more specific to what you mean
7   at some point?
8   A.  Again that wasn't on the document, I
9   didn't look at dates or contracts.  It could most
10   likely be in 2018, UHC placed some accounts with
11   JTM.
12   Q.  UHC placed the accounts with JTM?
13   A.  Yes.
14   Q.  So JTM was a master servicer but didn't
15   own the debts?
16   A.  Yes.
17   Q.  And what was your role, I asked if you
18   were an officer but what was your role at United
19   Holdings?
20   A.  Chief operations officer.
21   Q.  What are you job responsibilities?
22   MR. LITTLE:  Objection, outside the
23   scope of the notice.  We are talking
24   about a different company, he is not
25   answering that question.

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                    Pages 26..29

Page 26

1
2      MS. ROBERTSON:  Okay but this
3  company comes up in the account notes.
4      MR. LITTLE:  Okay, I will take a
5  look at it if you want to point me to it.
6      MS. ROBERTSON:  I am going to be
7  producing this as an exhibit but I don't
8  want to mark it yet but just calling your
9  attention right here there is a note that
10  says portfolio has been changed from to
11  UHC.
12      MR. LITTLE:  You can ask him about
13  what he does at UHC, that's fine.
14      Q.  What do you do in your role as chief
15  operating officer at UHC?
16      A.  I manage the operations of the company,
17  meaning our law firms and collection agencies that
18  service for us.
19      Q.  How many people work at UHC?
20      A.  About 11.
21      Q.  Now I know that JTM is currently in wind
22  down but in the years 2017 to 2019 before it was in
23  wind down when it was collecting the debts at issue
24  here how many employees did it have?
25      A.  Two.

Page 27

1
2      Q.  Two employees?
3      A.  It may be two or three.
4      Q.  Who were those employees?
5      A.  Mike Hyla, Jay Connely, and Christina
6  Saywa.
7      Q.  So those were the people working in those
8  years?
9      A.  Yes, there were a few administrators that
10  were there but I would have to go back to the
11  records.  I don't have specifics but those were the
12  consistency.
13      Q.  What was Mr. Hywa's job title?
14      A.  Compliance manager and I believe that was
15  in 2018.
16      Q.  What did he do as compliance manager?
17      A.  He managed the interface between the
18  agencies and us and JTM.
19      Q.  The third party collectors you hired?
20      A.  I want to be clear, we subcontract
21  companies not collectors.  There are no actual
22  collectors by JTM, we contract with agencies
23  directly not collectors themselves.
24      Q.  Not the employees of the collection
25  agencies?

Page 28

1
2      A.  Yes.
3      Q.  What about Jay Connely?
4      A.  Vendor manager.
5      Q.  What does that mean?
6      A.  Managed performance for the collection
7  agencies.
8      Q.  Performance for the collection agencies?
9      A.  Yes.
10      Q.  How was his role different than Mikes?
11      A.  It was more tailored around if there was
12  a complaint or something along those lines.  Jay's
13  was more trying to be more proactive, to avoid
14  complaints, best practices as much as we could.  We
15  want to make sure people are following our
16  agreements, things of that nature.
17      Q.  When you say vendor you are referring
18  also to the collectors?
19      A.  No, again we don't have interface with
20  the collectors.
21      Q.  How many clients did JTM have in 2017 and
22  this could be a ballpark?
23      MR. LITTLE:  This is broad, can you
24  narrow it down.  What do you mean by
25  client?

Page 29

1
2      Q.  How many creditors were you managing
3  debts for?
4      A.  We didn't purchase debt directly from
5  creditors until 2017 or late 2018.
6      Q.  So who were you purchasing from before
7  that?
8      A.  Other debt buyers.
9      Q.  So between 2013 about 2016 to 2017 you
10  were exclusively buying from other debt buyers?
11      A.  For the most part, yes.
12      Q.  2017 to 2018 you start buying from
13  creditors?
14      A.  Yes, late 2017.
15      Q.  Pretend I'm someone that is potentially
16  interviewing for a job with you, what's the
17  difference between buying directly from a creditor
18  versus a debt buyer, is there a difference on how to
19  purchase it?
20      A.  Not particularly, the principals are the
21  same.  If you purchase directly from the creditor
22  you get better communication from say creditor
23  versus having intermittent part ones or multiple
24  parties in between, so these accounts in question
25  were purchased from joint ventures with other debt

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                    Pages 30..33

Page 30

1
2  buyers, we didn't have any direct communication with
3  the issuers directly.
4      Q.  Now you said joint ventures?
5      A.  Yes.
6      Q.  So when you say that you purchased debts
7  from other debt buyers you were doing this as a sole
8  purchaser, as a joint venture or both?
9      A.  Every deal could be different, it's hard
10 to get specific unless we are talking about a
11 specific transaction.
12     Q.  What percentage of your purchases would
13 you say are joint ventures?
14     A.  I wouldn't want to speculate on that, I
15 couldn't even tell you without looking, I would have
16 to look.
17     Q.  Today are you the only employee of JTM?
18     A.  Yes.
19     Q.  How long has that been the case?
20     A.  Since late '17 to 2018 I believe.
21     Q.  I apologize, I want to make sure I
22 understand the timeline.  Didn't you say that Jay
23 Connely began in 2018?
24     A.  No.
25     Q.  Or Mike?

Page 31

1
2      A.  Yes, Mike was more in line of that.
3  Again my timeline may be off but he wasn't at JTM
4  very long.
5      Q.  A matter of months?
6      A.  Probably a year, I may be off a few
7  months but yes, he wasn't there very long.
8      Q.  Mike Hyla, Jay Connely and there was
9  another name Christina Saywa what was her role?
10     A.  Accounting, she posted payments from our
11 vendors.
12     Q.  How long was she there?
13     A.  A year or two.
14     Q.  What years were those?
15     A.  Towards the latter, I would say from 2016
16 sometime you know until the end.
17     Q.  Between Mr. Hyla and Ms. Saywa do any of
18 these employees work for you at UHC now?
19     A.  Yes.
20     Q.  Which ones?
21     A.  Jay and Christina.
22     Q.  Mr. Hyla is no longer?
23     A.  No.
24     Q.  And so when he left at some point in 2018
25 not long after he started he didn't work for any of

Page 32

1
2  your other companies?
3      A.  I'm sorry, say that again.
4      Q.  After his role at JTM you said it was a
5  few months?
6      A.  Yes.
7      Q.  He had no other roles for any other
8  companies of yours?
9      A.  He worked for UHC for a time.
10     Q.  How long was that?
11     A.  18 months maybe.
12     Q.  So about a year and a half?
13     A.  Yes, give or take.
14     Q.  What year was that?
15     A.  I think he left sometime in 2020.
16     Q.  So he no longer works for any company
17 that you own or work for?
18     A.  No.
19         (Whereupon, an off-the-record
20 discussion was held at this time.)
21         (Whereupon, the aforementioned
22 document was marked as Plaintiff's
23 Exhibit 2-4 for identification as of this
24 date by the Reporter.)
25     Q.  This is the file complaint, have you seen

Page 33

1
2  this document before today?
3      A.  I'm sure I have seen it but I may have
4  not read it.
5      Q.  Are you familiar with the allegations of
6  the complaint?
7      A.  Yes.
8      Q.  Briefly how would you sum up the
9  allegations?
10     A.  False.
11     Q.  What would you summarize the allegations
12 to be?
13     A.  I'm sorry, I don't understand that
14 question.  I'm not trying to be difficult, I just
15 don't understand it.
16     Q.  That's okay, can you review to yourself.
17 You don't have to read it out loud, can you review
18 paragraphs 8, 9, 10, can you read paragraph ten?
19     A.  Therefore defendant JTM bought, obtained
20 Ms. Mullery's alleged continental account, ignored
21 information in the account notes that told as
22 successor and interest that it could no longer call
23 or write Ms. Mullery and other debt collectors
24 at North Star Location Services.  Sent Ms. Mullery a
25 collection notice dated January 26, 2017 demanding

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                    Pages 34..37

Page 34

1
2  payment of Continental debt, a copy of this
3  collection letter is attached as an exhibit.
4      Q.  So you understand that my client is
5  alleging that your client violated the FDCPA by
6  outsourcing or hiring a debt collector to collect
7  the debt after she had demanded that communication
8  seize and had refused to pay the debt?
9      MR. LITTLE:  Objection to form.
10     Q.  You can answer if you know.
11     A.  Yes, I am aware of what the allegations
12  are.
13     Q.  Have you seen this before today?
14     A.  No.
15     Q.  Can you look at it briefly and let me
16  know when you are done?
17     A.  Okay.
18     Q.  This letter was sent by an organization
19  called Legal Advocates for seniors and people with
20  disabilities, can you read off the address here?
21     A.  211 West Wacker Drive, Suite 750,
22  Chicago, Illinois 60606.
23     Q.  And this is addressed to Continental
24  Finance Company, this is not addressed to JTM?
25     A.  That's correct.

Page 35

1
2      Q.  And the letter here does a few things, it
3  tells the recipient that Ms. Mullery has an
4  attorney, correct?
5      A.  Yes.
6      Q.  It tells the recipient that Ms. Mullery
7  cannot pay her debts, correct?
8      A.  Yes.
9      Q.  And that she refuses to pay the debts?
10     A.  Was that a question?
11     Q.  Yes.
12     A.  Yes, that's what it says.
13     Q.  Also it says that her income is low and
14  would not be subject to garnishment, correct?
15     A.  That's what it says.
16     Q.  This is a scanned version of what is
17  clearly not white paper so it is hard to read but
18  once you are able to read the texts and able to
19  review this let me know, have you seen this before
20  today?
21     A.  I have not.
22     Q.  I am going to ask you to confirm a few
23  things about this letter.  Who does the letter
24  identify as the current creditor?
25     A.  JTM.

Page 36

1
2      Q.  Can you describe where that is
3  identified?
4      A.  Under current creditor.
5      Q.  So top right hand corner?
6      A.  Yes, top right hand corner.
7      Q.  Middle of the page?
8      A.  Yes.
9      Q.  And then in the sentence right here it
10  says that your account has been referred by JTM,
11  correct?
12     A.  Yes.
13     Q.  So three times?
14     A.  Yes.
15     Q.  I want to go specifically to paragraph 10
16  because that's one of them that we recently read,
17  can you read the answer in paragraph 10?
18     A.  Defendant denies each and every
19  allegation in paragraph ten.
20     Q.  Going back to paragraph ten which is in
21  Exhibit 2 do you deny that JTM bought the
22  Continental finance account?
23     A.  No.
24     Q.  Do you deny that JTM ignored information
25  in its account note that indicated that she had an

Page 37

1
2  attorney and refused to pay the debts?
3      A.  Yes.
4      Q.  Do you deny that JTM sent the letter to
5  Northstar Location Services for collection?
6      MR. LITTLE:  Objection to form.
7      Q.  You can answer.  Do you deny that JTM
8  sent the debt to NorthStar Location Services for
9  collection?
10     A.  No.
11     Q.  Exhibit 3 here your answer, have you
12  reviewed this before today?
13     A.  I probably have but I don't recall what
14  it says.
15     Q.  This is not among the documents that you
16  reviewed yesterday?
17     A.  I didn't review this specific document.
18     Q.  Are you familiar with your affirmative
19  defenses?
20     A.  Yes.
21     Q.  So here they are some of them, I can
22  scroll down so you can see them.  There are 8 of
23  them and you have been in this industry for awhile,
24  are you familiar with the defense of bonafide error?
25     A.  Yes.

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                              Pages 38..41

Page 38

1
2    Q.  You acknowledge that you have not raised
3  such defense?
4    A.  Yes, it's not in here correct.
5    Q.  Have you reviewed any of the discovery in
6  this matter?
7    A.  I reviewed the account notes and again I
8  did a late review yesterday, I didn't review it in
9  detail.
10   Q.  How long would you say you spent?
11     MR. LITTLE:  When you say this
12  matter are you talking specifically about
13  Mullery?
14     MS. ROBERTSON:  I am.
15   A.  I would say ten minutes.
16   Q.  These are JTM discovery responses that
17  were produced in August of 2019.
18     MR. LITTLE:  Is this Exhibit 4?
19   Q.  Did you review these in 2019?
20   A.  I'm sure I did.
21   Q.  Before I get to the specific questions I
22  am going to go to the verification because these
23  were verified.  Do you recall if you verified these?
24   A.  Again I don't recall specifically, no.
25   Q.  It looks like Mr. Hyla verified this set,

Page 39

1
2  did you work with him at all when he was reviewing
3  these?
4    A.  No.
5    Q.  Looking specifically at question number
6  one and two and if you could go a little slower just
7  for the sake of the reporter, can you read the
8  question number one in your response?
9    A.  State each date which you were notified
10  that Ms. Mullery was represented by counsel as to
11  the debt at issue.  Response, JTM learned that
12  plaintiff was represented by counsel on or about
13  November 7 when it was served with the subject
14  complaint.
15   Q.  So you didn't know that she had requested
16  from the original creditor that it seize contacts?
17   A.  Absolutely not.
18   Q.  Does JTM have a policy as to what to do
19  if it does know such information?
20   A.  I'm not sure again on written policy but
21  I'm familiar with the FDCPA and our position is if
22  we received written response of representation we
23  would seize communication in order to avoid things
24  like this.
25   Q.  So it had to be in writing?

Page 40

1
2    A.  It would have to be if the issuer sold it
3  to someone else and they were notified and then they
4  notified us then we would obviously not communicate
5  but it typically doesn't get passed down to us.
6    Q.  Typically you buy in and don't get that
7  information is what you are saying?
8    A.  We do not, no.
9    Q.  Do you request that information?
10   A.  No.
11   Q.  So when you learn the information because
12  someone filed the lawsuit you respond by doing what?
13   A.  We put the account in legal status as you
14  see from the screen shot and seize communication.
15   Q.  What if one of your collectors tells you
16  about it?
17   A.  JTM doesn't have collectors.
18   Q.  What if one of your collection agencies
19  tells you about it?
20   A.  Same scenario, it would get shut down.
21   Q.  What if the consumer somehow tracks JTM's
22  information and contacts the organization or her
23  attorney contacts your organization would you shut
24  it down as well?
25   A.  Yes.

Page 41

1
2    Q.  What if you buy something and I think you
3  mentioned that you don't typically ask for this
4  information but what if you buy something and you
5  are given that information?
6    A.  If it exists then they shouldn't have
7  sold it to us so if it exists then it shouldn't be
8  in a portfolio and we submit it for put back and
9  close it.
10   Q.  So in this case you learned about it for
11  the first time when you were served with this
12  lawsuit?
13   A.  Yes.
14   Q.  And number two is a similar question,
15  this time we are not talking about representation by
16  counsel but refusal to pay, can you read the request
17  and response for number two?
18   A.  Read it aloud?
19   Q.  Yes and I won't do this for every single
20  question.
21   A.  State each date on which you were
22  notified that Ms. Mullery refused to pay the debt,
23  when reviewing the plaintiff's complaint and subject
24  matter JTM learned that the plaintiff was
25  alleging --

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                    Pages 42..45

Page 42

1
2      Q.  So same response, you didn't know
3  anything about her refusal or inability to pay until
4  you got served with this lawsuit?
5      A.  Yes.
6      Q.  I am going to skip around a bit, like I
7  said I am not going to have you read each one but
8  there is one that I want to end on so I am going to
9  skip to your document production responses because
10  earlier you said that you were aware of and
11  understood the affirmative defenses that you are
12  bringing in this case, correct?
13      A.  Correct.
14      Q.  So can you read document production
15  request number 23 and your response.
16      A.  All documents that refer to, relate to or
17  support or diminish each of the affirmative defenses
18  that you asserted.  Response, JTM account notes and
19  information provided when JTM acquired them.
20      Q.  And you produced a few things in
21  conjunction with this request and it's actually all
22  included in this document so it's the account notes
23  which are screen shots from the computer, correct?
24      A.  Yes, I believe so.
25      Q.  And you produced a collection services

Page 43

1
2  agreement with North Star Location Services?
3      A.  Yes.
4      Q.  And then the last thing that you produced
5  is what appears to be a single line from a
6  spreadsheet with the rest of the spreadsheet
7  redacted?
8      A.  Yes.
9      Q.  Sometimes I hear that referred to as a
10  receivables file is there a word that you use?
11      A.  It's Exhibit A but again you can call it
12  whatever.
13      Q.  You would use that as Exhibit A that's
14  confusing, I will refer to it as a spread line.  So
15  those are the only documents that you produced?
16      A.  Yes.
17      Q.  You never supplemented that response?
18      A.  Not to my knowledge.
19      Q.  Now I am working with you a little bit
20  backwards, I am going to put back a couple of
21  document production requests, so number 7 asks for
22  all documents that show the dates in which you
23  obtained the debt at issue and the amount of the
24  debt on that date.  I just read the request there is
25  no reason for you to read it, can you read your

Page 44

1
2  response?
3      A.  See the account notes and information
4  provided when JTM acquired the debt.
5      Q.  So the answer is as to when JTM obtained the
6  debt at issue is going to be in the account notes?
7      A.  Should be.
8      Q.  Information provided when JTM acquired
9  the debt what is that?
10      A.  Whatever we were provided we provided
11  what we had.
12      Q.  Which one do you believe has the date on
13  which JTM purchased the account?
14      A.  It would be the screen shots.
15      Q.  Is the date that JTM obtained the account
16  on this page?
17      A.  It is not.
18      Q.  Is the date that JTM obtained the account
19  on this page?
20      A.  If you look at – yes, it is.
21      Q.  And what is that date?
22      A.  3/17/2016.
23      Q.  Can you indicate to me where that is
24  stated?
25      A.  It says in review that is when the

Page 45

1
2  account was loaded and acquired.
3      Q.  In preview?
4      A.  Yes, I'm sorry.
5      Q.  So that tells us the account was loaded
6  on that day?
7      A.  Yes.
8      Q.  How does that tell us the account was
9  purchased on that day?
10      A.  Loads and purchase dates typically
11  coincide.
12      Q.  Whose name is next to the load?
13      A.  Mine.
14      Q.  So you loaded this account?
15      A.  Yes.
16      Q.  I have a few other questions about these
17  account notes before I go back to the production
18  request and responses and this is all part of the
19  same exhibit so here it says client is UDH, what
20  does that mean?
21      A.  That's where we purchased the account
22  from.
23      Q.  So what is UDH?
24      A.  Debt buying company.
25      Q.  Is that its full name?

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                    Pages 46..49

Page 46

1
2    A.  United Debt Holdings.
3    Q.  Was this a joint venture or a direct
4  purchase?
5    A.  Joint venture I believe.
6    Q.  Do you have any documentation of the
7  joint venture?
8    A.  No.
9    Q.  Did UDH maintain ownership rights of this
10  debt or portfolio?
11    A.  It was joint ownership.
12    Q.  So you both owned it?
13    A.  Yes.
14    Q.  And do you remember how many the proceeds
15  were to be split?
16    A.  I do not.
17       MR. LITTLE:  Form.
18    Q.  Did UDH own the debt in full at the time
19  that JTM became involved?
20       MR. LITTLE:  Form.
21    A.  I don't know, I can't answer that
22  question.
23    Q.  Do you remember if the proceeds from the
24  collection were split 50/50 or any other way?
25    A.  I don't recall ma'am.

Page 47

1
2    Q.  Was there a written joint venture
3  agreement?
4    A.  Not to my knowledge no.
5    Q.  Who at JTM arranged or agreed to the
6  joint venture?
7    A.  It would have been me.
8    Q.  But it wasn't in writing?
9    A.  It was not.
10    Q.  Between JTM and UDH who was to maintain
11  the receivables files?
12       MR. LITTLE:  Form.
13    A.  I don't recall specifically.
14    Q.  Did JTM ever have the receivables file?
15       MR. LITTLE:  Objection to form,
16  what is a receivables file?
17    Q.  Did JTM ever have documentation after
18  this debt?
19    A.  Define documentation.
20    Q.  Anything that would prove that you owned
21  the debt?
22    A.  No.
23    Q.  When you entered this joint venture did
24  you exchange any money with UDH?
25    A.  I don't recall.

Page 48

1
2    Q.  Do you know who you spoke with at UDH?
3    A.  Probably Craig Mansoff.
4    Q.  What is his role at UDH?
5    A.  I'm not sure.
6    Q.  Is he still there?
7    A.  Not to my knowledge, I believe UDH went
8  out of business two or three years ago.
9    Q.  I have a few other questions about the
10  collection notes that I want to get through before I
11  flip to another exhibit here.  There are things
12  about these collection notes that I think I
13  understand but I want to confirm with you because
14  this isn't my system and like I explained when I was
15  setting out the ground rules there are things that
16  you understand that I probably don't understand and
17  vice versa right.  Is this JTM's computer system?
18    A.  Yes.
19    Q.  So this is what you use to run your
20  machines?
21    A.  This is our data system.
22    Q.  What is the software system called?
23    A.  Beam.
24    Q.  It's the name of the program that you
25  beam out the accounts?

Page 49

1
2    A.  Yes.
3    Q.  Going back to the earliest date when you
4  loaded it looks like you were beaming out to
5  different companies, can you confirm this entry on
6  1/17 what does the note say?
7    A.  Beamed out to North Star.
8    Q.  North Star Location Services?
9    A.  Yes.
10    Q.  And you already explained that you did
11  hire them as a collection agency to collect this
12  debt?
13       MR. LITTLE:  Form.
14    Q.  Correct?
15    A.  Correct.
16    Q.  Prior to that though you had beamed out
17  to several other collection agencies one of them was
18  the first one, you can read this entry on 3/17/2016
19  who was it beamed out to on that day?
20    A.  Global Resolution Group.
21    Q.  Can you read this entry on 7/14/17, well
22  I have to take that back because this is a different
23  collection agency name here.
24    A.  That's correct.
25    Q.  They are all very similar, there should

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                      Pages 50..53

Page 50

1
2  be more creative names.  At some point it's beamed
3  out to Global Mediation Groups, correct?
4      A.  Yes.
5      Q.  Can you read this entry on 7/14/2017?
6      A.  Added to queue cease and desist.
7      Q.  What does that mean to you?
8      A.  It means that the collection agency
9  either was told not to call the consumer or received
10  some sort of written documentation and we closed the
11  account, put it to cease and desist.
12      Q.  Can you tell me what indicates that you
13  closed the account?
14      A.  The queue itself cease and desist.
15      Q.  But would you agree with me then that you
16  knew before November 7 that Ms. Mullery had
17  requested that communications cease and that she
18  refused to pay this debt?
19      A.  That date specifically?
20      Q.  That JTM knew?
21      A.  I don't know specifically what JTM knew.
22      Q.  Would you agree that your account notes
23  say that she refused to pay the debt and that
24  collection cease in July of 2017?
25      MR. LITTLE:  Objection to form.

Page 51

1
2      Q.  You can answer if you know.
3      A.  I don't know.
4      Q.  The phone number for Ms. Mullery has a
5  note that says "hot", what does that mean?
6      A.  Simply means that's our knowledge of her
7  direct number.
8      Q.  Does it mean that one of the collection
9  agencies has reached her at that number?
10      A.  No, it doesn't mean that, it means to the
11  best of our knowledge that's her phone number.
12      Q.  I don't want you to read this entire
13  address because I don't want it to be redacted from
14  the record but can you verify the state of her
15  address?
16      A.  New York.
17      Q.  Can you explain to me, because you loaded
18  this account, can you explain to me the process of
19  loading an account like this?
20      A.  I have not loaded an account in at least
21  three years so I can't gently explain it at
22  this point.
23      Q.  What do you get that gets this
24  information into the system, is it automatic?
25      A.  No, it's an excel spreadsheet.

Page 52

1
2      Q.  Do you physically sit down and enter all
3  of the information by hand into the system?
4      A.  No, all of the information gets mapped in
5  from the excel spreadsheet.
6      Q.  So it would take the address and put it
7  in the address cell and the phone number and put it
8  in the phone number cell?
9      A.  Yes.
10      Q.  And then you would go through make sure
11  everything is correct or do you even take that step?
12      A.  We run exceptions and things of that
13  nature, so to the best of our knowledge we validate
14  the information.
15      Q.  Now I only have the one line through the
16  spreadsheet so I don't know how big this portfolio
17  was, how many debts would you say are typically in a
18  portfolio?
19      MR. LITTLE:  Objection, you can
20  answer if you know.
21      A.  I can't answer because it varies.
22      Q.  Are there ever less than 100?
23      A.  It could be, you buy a specific dollar
24  amount.  In theory it could be, it could be
25  anything, it could be a million, it could be one if

Page 53

1
2  you choose to buy one.
3      Q.  When you load these accounts, well when
4  you loaded this account in this portfolio do you
5  recall how long you spent running exceptions?
6      A.  I do not.
7      Q.  How long do you typically spend, how many
8  hours or minutes?
9      A.  Again it's tough for me to answer that
10  question, it's been several years.
11      Q.  And this is still the same exhibit, you
12  would agree that this was produced by you in
13  response to our discovery requests?
14      A.  Correct, it would have been produced by
15  JTM.
16      Q.  And there is Ms. Mullery's name, account
17  number, information, do you know what this means
18  system FDR?
19      A.  I don't recall ma'am.
20      Q.  Are these your documents, is this
21  something generated and kept by JTM?
22      A.  I think we generated specifically, it's
23  not something that we keep on individual accounts,
24  I think we didn't -- we exported it from our system
25  for you specifically.

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                    Pages 54..57

Page 54

1
2    Q.  What system is that?
3    A.  Beam.
4    Q.  This is exported from Beam?
5    A.  Correct, all of the information that we
6    had we provided.
7    Q.  And all of the information that you had
8    was in Beam?
9    A.  Yes.
10   Q.  So when it says System FDR do you know
11   what that means?
12   A.  I don't.
13   Q.  Can you read the address?
14   A.  211 West Wacker Street, suite 750,
15   Chicago, Illinois 60606.
16   Q.  And then there is a phone number
17   beginning with a 312?
18   A.  Yes.
19   Q.  Have we seen this address before?
20   A.  I believe so.
21   Q.  And when was that?
22   A.  I'm not sure, I know that we just seen it
23   recently.
24   Q.  I can refresh your recollection, going
25   back to the complaint Exhibit 2 would you confirm

Page 55

1
2    this is the same address?
3    A.  Yes.
4    Q.  So this is her attorney's address?
5    A.  Yes.
6    Q.  Now if the accounts are loaded
7    automatically on the excel spreadsheet how is it
8    that this address was not listed in your system?
9    A.  We probably updated it when we got served
10   and this was provided after the fact.
11   Q.  So probably you updated it when you got
12   served with the lawsuits?
13   A.  Yes.
14   Q.  Why then was the collection letter from
15   North Star Location Services sent to her home
16   address?
17   A.  Because we were served after the letter
18   was sent.
19   Q.  But if you didn't update the address
20   until after the letter was sent North Star would
21   have had this address?
22   A.  No, ma'am when we were sued by you guys,
23   when you guys served us we would update the
24   information that was provided to us.  So again, I
25   can't speak specifically all I know is that when we

Page 56

1
2    get information to us for attorney rep we will
3    update the system.
4    Q.  So you think that this address in the
5    spreadsheet is something that you updated after the
6    fact?
7    A.  I honestly don't know ma'am, I can't
8    attest to it because I don't know the answer.
9    Q.  Would you confirm that this was sent to
10   Ms. Mullery in what state?
11   A.  New York.
12   Q.  Going back to your document production
13   this phone number again begins with 312, I'm in
14   Chicago this is the Chicago area code, you may not
15   be aware of that but if we go back to the account
16   notes is there a 312 number anywhere on here?
17   A.  No but it looks like there was another
18   number in there, it's not uncommon for us to have
19   multiple numbers and addresses for consumers.
20   Q.  Is there another address in here?
21   A.  I can't tell from this particular screen
22   shot.
23   Q.  Well is there another address for Ms.
24   Mullery, I can show you the other screen shot.
25   Apparently this is all you have and all you produced

Page 57

1
2    to us, is there another address for Ms. Mullery
3    here?
4    A.  No.
5    Q.  On this date on November 8, 2017 can you
6    read the note from what looks like Michael Hyla?
7    A.  On November 8 it says legal action.
8    Q.  Now looking at all of the account notes
9    subsequent to that day is there anything that
10   indicates that you would have changed or entered new
11   contact information for her?
12   A.  No.
13   Q.  Had that occurred would that be noted in
14   here?
15   A.  I'm not sure.
16   Q.  So for example if you found out from a
17   collector this home number that is marked as hot is
18   a bad number, it's disconnected you don't know
19   whether that would be noted in your system?
20   A.  I don't know ma'am.
21   Q.  Do you know what charge off type 97 is?
22   A.  I don't know, it was probably information
23   provided.
24   Q.  By who?
25   A.  UDH.

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                    Pages 58..61

Page 58

1
2      Q.   Can you without reading the entire
3    address note the state in this address one?
4      A.   New York.
5      Q.   And what does app address mean, do you
6    know what that refers to?
7      A.   No.
8      Q.   So somehow this app address which seems
9    to be secondary in the notes made its way to the
10   system as her primary address?
11         MR. LITTLE:  Form.
12     Q.   Is that true?
13     A.   I believe so.
14     Q.   Can you identify what is marked as the
15   UDH purchase date?
16     A.   You want me to say it?
17     Q.   Yes.
18     A.   May 28, 2015.
19     Q.   So they bought it May 28, 2015 you
20   believe that your joint venture started March 17,
21   2016 when you loaded it into your system?
22     A.   Yes.
23     Q.   What does this flex tag UDH2 mean?
24     A.   I don't know.
25     Q.   I know I have been scrolling kind of

Page 59

1
2    fast, this last thing says seller Continental
3    Finance Company, LLC so what does that mean?
4      A.   It means, I would venture to assume –
5          MR. LITTLE:  We don't want you to
6    assume.
7      A.   I don't know specifically what it means.
8      Q.   Well it says that Continental Finance
9    Company sold the debt, correct?
10         MR. LITTLE:  Form.
11     A.   Correct, that's what it says.
12     Q.   Generally that means they are the party
13   that sold the debt to apparently here as UDH?
14     A.   Yes.
15     Q.   Now I know I scrolled through this fast
16   and I am happy to drop this in the chat and review
17   it but was JTM mentioned anywhere in this
18   spreadsheet?
19     A.   Not to my knowledge.
20     Q.   Do you want to review it?
21     A.   Sure.
22     Q.   This includes the collection services
23   agreement so if you want to look just at the
24   spreadsheet go all the way to the bottom once you
25   open it.

Page 60

1
2      A.   You are correct.
3      Q.   JTM is not mentioned anywhere in this
4    spreadsheet?
5      A.   No.
6      Q.   This information about UDH to flex tag
7    did anyone at JTM or formally JTM potentially at UDH
8    know what that means?
9      A.   Not to my knowledge and I can't speak for
10   UDH.
11     Q.   I am going to go back to the document
12   production request, this has been the subject of
13   some motion practices as you may be aware.  Can you
14   read the request and your response for number 6 and
15   again try to do it slowly for the sake of the
16   reporter.
17     A.   All documents regarding Ms. Mullery's
18   alleged Continental Finance credit union account,
19   including but not limited to any asset, purchase
20   forward flow agreements, signed account agreements
21   card carriers, terms and conditions and any
22   correspondence from Ms. Mullery or her attorney.
23   Response JTM objects to this request as it seeks
24   information outside allegations of complaint and not
25   proportional to the needs of the case, specifically

Page 61

1
2    the FDCPA is a strict liability statute and the
3    terms under which JTM acquired plaintiff's account
4    have no bearing on whether it violated the FDCPA
5    here.  In addition JTM objects as this request seeks
6    confidential and proprietary information, JTM is
7    withholding information responsive to this request
8    not withstanding and without waiver foregoing, other
9    than what's attached to the complaint.  JTM does not
10   process any correspondence from plaintiff or her
11   attorney.
12     Q.   I am going to break this down a little
13   bit, I know that you objected to this request
14   because you didn't believe it was relevant or
15   proportional to the needs of the case but
16   specifically you said that JTM is withholding
17   information responsive to this request.  When this
18   request was made did you seek this information, did
19   you try to find it?
20     A.   No.
21     Q.   So you didn't try to find any asset
22   purchase agreement or flow agreement assignments?
23     A.   We determined it wasn't relevant so no
24   Brendan and I discussed it.
25         MR. LITTLE:  I don't want you to

THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC
Jacob Adamo on 05/20/2021                                    Pages 62..65

Page 62

1
2   talk about conversations that you had
3   with me.
4       Q.  So you did not attempt to find it?
5       A.  I did not.
6       Q.  You did not reach out to UDH to see if
7   they had anything?
8       A.  I did not.
9       Q.  To the best of your recollection did you
10  have anything at that time?
11      A.  I don't believe so to the best of my
12  knowledge.
13      Q.  Did any money exchange hands between JTM
14  and UDH regarding the purchase of this portfolio?
15      A.  I don't recall.
16      Q.  Have you researched this, have you looked
17  at your books to see if anyone exchanged hands?
18      A.  I have not.
19      Q.  Has anyone else?
20      A.  Not to my knowledge.
21      Q.  That discovery response was the subject
22  of some motion practice, we move to compel the
23  response you and your counsel objected to the motion
24  to compel but ultimately it was compelled and then
25  JTM issued supplemental responses, were you aware

Page 63

1
2   that supplemental responses were issued?
3       A.  Possibly, I don't recall specifically.
4       Q.  Have you reviewed the supplemental
5   responses?
6       A.  I may have at some point, again I don't
7   recall specifically.
8       Q.  These are the supplemental responses.
9          (Whereupon, the aforementioned
10         document was marked as Plaintiff's
11         Exhibit 5 for identification as of this
12         date by the Reporter.)
13      Q.  Exhibit 5 and again same request number 6
14  you don't have to read the request again but can you
15  read JTM's supplemental response and if you would do
16  so slowly for the reporter.
17      A.  JTM objects to this request as it seeks
18  information outside the allegations of the complaint
19  and not proportional to the needs of the case.
20  Specifically the FDCPA is a strict liability statute
21  and the terms under which JTM acquired plaintiff's
22  account have no bearing on whether it violated the
23  FDCPA hear in.  In addition JTM objects to this
24  request as it seeks confidential and proprietary
25  information, not withstanding and without waiver of

Page 64

1   the foregoing other than what is attached to the
2   complaint.  JTM does not possess any correspondence
3   from plaintiff or her attorney or any additional
4   documents responsive to this request.
5       Q.  You would agree that this is similar to
6   your last response?
7       A.  Yes.
8       Q.  Just breaking this down again, you object
9   even though the court did compel you to produce
10  whatever you had and you responded that you didn't
11  have any such documents?
12         MR. LITTLE:  Objection to form.
13      Q.  Correct?
14      A.  Correct.
15      Q.  Did you look?
16      A.  I believe we did at this time and nothing
17  exists.
18      Q.  So by the time you were compelled to look
19  for something you couldn't find anything?
20      A.  Correct, something may not have existed
21  in the first place, we did a lot of handshake deals.
22      Q.  You did a lot?
23      A.  I guess, defining a lot would be
24  difficult but we have done handshake deals.

Page 65

1
2       Q.  Percentage of your business with
3   handshake deals?
4       A.  It would be hard to define.
5       Q.  Who shook whose hand?
6       A.  UDH and JTM specifically.
7       Q.  You identified someone at UDH previously,
8   I can't remember Michael had been the first name who
9   at UDH?
10      A.  Craig Mansoff.
11      Q.  Is he the only person at UDH that you
12  were making these oral and written agreements with?
13      A.  I don't recall.
14      Q.  Do you recall any of the terms of these
15  agreements?
16      A.  Not specifically, no.
17      Q.  How many would you say you did, let's
18  start in the relevant years because you know the
19  years that these debts were purchased, how many
20  would you say you did in 2016 with UDH?
21         MR. LITTLE:  Outside the scope of
22      the notice, his answer is not going to
23      bind the company.  You can answer if you
24      know.
25      A.  I don't recall.

THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC
Jacob Adamo on 05/20/2021                                    Pages 66..69

Page 66

1
2   Q.  2017?
3       MR. LITTLE:  Same objection.
4   A.  I don't recall.
5   Q.  2018?
6       MR. LITTLE:  Same objection.
7   A.  I don't recall.
8   Q.  How big of a joint venture client was UDH
9   with JTM and a percentage of your business?
10      MR. LITTLE:  Same objection.
11  A.  I don't know specifically.
12  Q.  Generally would you say it represented a
13  significant part of your business?
14  A.  I don't want to answer --
15      MR. LITTLE:  Same objection.
16  A.  I don't specifically know.
17  Q.  Well previously you testified that you
18  did a lot of handshake details?
19  A.  And then I corrected my statement.
20  Q.  Corrected to saying that you couldn't
21  define a lot?
22  A.  Yes.
23  Q.  Would you say more than five?
24  A.  I wouldn't say more than anything because
25  again I don't know specifically and I don't want to

Page 67

1
2   give the wrong answer.
3   Q.  Would there be any way for you to find
4   out, they are handshake deals but there has to be
5   some evidence?
6   A.  I'm not sure ma'am.
7   Q.  Were you doing handshake deals with other
8   companies?
9   A.  We have done them in the past, yes.
10  Q.  Regularly?
11      MR. LITTLE:  Objection to form.
12  A.  With at least one other company correct.
13  Q.  At least one other company?
14  A.  To my knowledge one other company.
15  Q.  What company was that?
16  A.  South Western Investment Group.
17  Q.  What else can you tell me about UDH,
18  where are they located?
19  A.  In Colorado.
20  Q.  No longer functional?
21  A.  No.
22  Q.  How did you become connected with UDH?
23  A.  Just industry, you know contacts nothing
24  specific.
25  Q.  Conventions?

Page 68

1
2   A.  Yes, probably.
3       (Whereupon, an off-the-record
4       discussion was held at this time.)
5   Q.  I am going to do a screen share going
6   back to Exhibit 2 and this is the complaint.  This
7   is the complaint that you were served in 2017.  We
8   went over a few allegations, I am going to go over a
9   specific part at the end here, page 6.  Do you see
10  that these are the attorneys that filed the lawsuit
11  from Phillips & Phillips, that is my name.  Can you
12  read the address and the city and state here?
13  A.  9760 South Roberts Road, suite one, Palos
14  Hills, Illinois.
15  Q.  This is the law firm that sued JTM on
16  behalf of Ms. Mullery, correct?
17  A.  Yes.
18  Q.  So after you were served with the
19  complaint would you have updated the information in
20  your account to this address?
21  A.  It doesn't happen in every account, it's
22  possible.  I can't speak to four years ago.
23  Q.  Why after you were served with this
24  lawsuit would you update the account information to
25  the legal aid attorneys?

Page 69

1
2   A.  Again, I was making an assumption at that
3   point ma'am and I corrected myself at the end saying
4   I couldn't speak to that.  I probably spoke out of
5   turn, I don't know specifically why or how that
6   address got there.
7   Q.  One more document that I want to go over
8   before we wrap this case up.  This is your discovery
9   responses and specifically the pages with the
10  account notes.  Now you mentioned that you had
11  handshake agreement with UDH and didn't have any
12  record of that joint venture, nothing in writing to
13  confirm the terms, you don't recall what the terms
14  were; is that correct?
15  A.  Yes.
16  Q.  And I don't know the answer to this but
17  when it says fee rate here at the bottom does that
18  refer to anything involving UDH?
19  A.  No, that's what we gave, the fee out to
20  the agencies, well that we gave the agencies
21  specifically.
22  Q.  So North Star Location Services for
23  example?
24  A.  Yes.
25  Q.  So if they got any payments on these

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                              Pages 70..73

Page 70

1
2   debts they would get to keep 35 percent?
3      A.  Yes.
4      Q.  But no indication on any of these pages
5   how much you had agreed to give UDH?
6      A.  Correct.
7      Q.  And you testified that UDH maintained at
8   least some ownership of this account?
9      A.  Correct.
10     Q.  So going back to Exhibit 2 and exhibit D
11  there of when it says current creditor JTM is that a
12  true statement?
13     A.  Yes.
14     Q.  How is that true if UDH owns at least
15  partially the account?
16     A.  It was a financial interest.
17     Q.  Can you explain what you mean by that?
18     A.  It would have been a financial interest,
19  they would have gotten a certain percent back.
20  Again, I can't speak to her because I don't remember
21  the terms of our agreement.
22     Q.  What's the difference between maintaining
23  a financial interest and maintaining ownership of
24  the debt?
25     A.  More technical, so again I don't recall

Page 71

1
2   the exact terms of the agreement but JTM is the
3   owner.
4      Q.  But my question is the difference between
5   owning the accounts and maintaining a financial
6   interest?
7      A.  We could have – it could have been
8   hypothetical in the sense where we owned it but we
9   didn't pay them completely up front.  We paid a down
10  payment and then had a payment interest, again I
11  don't remember the specific terms of our agreement
12  at that time so it's merely financial.
13     Q.  That concludes all of my questions about
14  the Mullery matter.  Now I am going to turn to the
15  Perry matter, this should take a lot less long
16  because the allegations are similar, very similar.
17  There will be questions like is this the same as
18  what you said for the Mullery matter, looks like we
19  took over two hours for the first one.  I imagine
20  this would be a lot less unless there is something
21  unexpected that needs to be discussed that I am not
22  aware of yet.  I am going to produce now Exhibit 6.
23      (Whereupon, the aforementioned
24      document was marked as Plaintiff's
25  Exhibit 6 for identification as of this

Page 72

1
2   date by the Reporter.)
3      Q.  This is the file complaint in Perry
4   versus JTM, again same questions that I asked for
5   Ms. Mullery, have you seen this before today?
6      A.  Same answer as before, I may have but not
7   in deep review.
8      Q.  Would you agree that the allegations are
9   similar, that Ms. Perry's alleged that JTM hired a
10  collector to contact her after she had notified her
11  original creditor that she refused to pay her debt
12  and was represented by an attorney?
13     A.  Yes, the allegations are the same.
14     Q.  Now in this case there is a different
15  original creditor, it's Commenity Bank slash Express
16  which is a retail outlet and the third party
17  collector is Weltman, Lineburg & Reese, would you
18  confirm that?
19     A.  Yes.
20     Q.  So then would you confirm that aside from
21  those two differences and then the date of the
22  letter which is March 4, 2017 paragraph ten is
23  pretty similar to Ms. Mullery's complaint?
24     A.  Yes.
25     Q.  I think this is exhibit C, you could

Page 73

1
2   review this briefly, would you agree that this is
3   similar if not nearly identical to exhibit C in the
4   Mullery matter?
5      A.  Yes.
6      Q.  And that it was sent from Legal Advocates
7   For Seniors and People From Disabilities in Chicago?
8      A.  Yes.
9      Q.  And it was sent to Express slash
10  Commendity Bank?
11     A.  Yes.
12     Q.  That it conveyed that Ms. Perry was
13  represented by an attorney who couldn't afford to
14  pay her debt and refused to pay her debts?
15     A.  Correct.
16     Q.  Exhibit D can you read this?
17     A.  Yes.
18     Q.  I want to make sure it wasn't too small
19  or anything, would you agree that this a letter from
20  Weltman, Weinburg & Reese Company essentially,
21  right?
22     A.  Yes.
23     Q.  Did you hire them to collect this debt?
24     A.  Yes.
25     Q.  Can you confirm Ms. Perry's address to

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                                    Pages 74..77

Page 74

1
2  which this was sent, the state?
3      A.  No, it looks like it's redacted to the
4  point where I can't confirm.
5      Q.  Can you tell what state that abbreviation
6  is now?
7      A.  Looks like SO, I don't think that's a
8  state.
9      Q.  Is it SC?
10     A.  I don't know.
11     Q.  But SC is a state?
12     A.  Yes.
13     Q.  Are you familiar with JTM's answer to the
14  complaint in this matter?
15     A.  Again I may have reviewed it at the time,
16  not in depth review.
17         (Whereupon, the aforementioned
18  document was marked as Plaintiff's
19  Exhibit 7 for identification as of this
20  date by the Reporter.)
21     Q.  Can you read your answer to paragraph
22  ten?
23     A.  JTM denies each and every allegation in
24  paragraph ten.
25     Q.  And we just looked at paragraph ten and

Page 75

1
2  decided it was about the same as Mullery's
3  complaint, do you deny that JTM bought the Commedity
4  Express account?
5      A.  Technically yes, we leased it.
6      Q.  What does that mean?
7      A.  It means that we leased ownership and
8  then we have to essentially – basically it meant we
9  couldn't litigate on it that was the only outcome.
10     Q.  Was this lease committed to writing?
11     A.  Not to my knowledge.
12     Q.  Who was the lease with?
13     A.  South Western Investment Group.
14     Q.  Do you deny that JTM ignored information
15  in the account notes that indicated that Ms. Perry
16  had an attorney and refused to pay the debt?
17     A.  Absolutely.
18     Q.  You deny that you ignored it or that it
19  was in the account notes?
20     A.  I deny that it was provided to us, it was
21  not provided to us to be clear.
22     Q.  So if you lease this debt that means to
23  you that you could collect but not litigate on it,
24  why did you send it to collection to a law firm?
25     A.  They are a collection agency as well.

Page 76

1
2      Q.  Did your agreement specify that they
3  could not litigate on it?
4      A.  I believe it was just a collection
5  services agreement.
6      Q.  Does that collection services agreement
7  specify that they couldn't litigate on it?
8      A.  I don't think it addresses it one way or
9  another, it's not a law firm services agreement
10  which are different.
11     Q.  Does the collection services agreement
12  address the issue of litigation?
13     A.  I believe it says you have to follow the
14  FDCPA it does not, if we are not intending to
15  litigate it you can't threaten litigation.  I'd like
16  to correct something if you don't mind, in terms of
17  lease we are allowed to litigate, we need to go
18  through Southwestern to do it so again I probably
19  misspoke on that but we are allowed to litigate but
20  would have to go through them.
21     Q.  Tell me a little bit about Southwestern
22  Investors Group and your lease with them, first of
23  all Southwest Investors Group still around?
24     A.  They are not, I believe they filed for
25  bankruptcy.

Page 77

1
2      Q.  When was that?
3      A.  I'm not sure, over a year ago I believe.
4      Q.  Your lease was it committed to writing?
5      A.  I don't believe so, I don't recall at the
6  time, again I believe we leased – it was five plus
7  years ago.
8      Q.  So pursuant to the lease South Western
9  Investors Group maintained ownership of the debt,
10  correct?
11     A.  No.
12     Q.  I want to make sure I understand, you own
13  the debt but you were leasing it from SouthWest
14  Collection Group?
15     A.  My understanding is that we own the debt
16  completely in terms of the lease.
17     Q.  But you had to go to Southwest Investors
18  Group to file a lawsuit even though you owned it?
19     A.  Yes.
20     Q.  So what ownership interest did they
21  maintain?
22     A.  They didn't, we had 100 percent rights to
23  the file, there were just litigation constraints.
24     Q.  So you couldn't have filed a small claims
25  suit without their permission, could you have filed

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                  Pages 78..81

Page 78
1
2  a proof of claim in bankruptcy?
3      A.  I don't recall the terms of the lease
4  specifically.
5      Q.  Did you negotiate the lease, was this
6  something that you did?
7      A.  Yes.
8      Q.  I know its dissolved and they declared
9  bankruptcy but who did you negotiate with at South
10  West Investors Group?
11     A.  I don't recall specifically.
12     Q.  Did you pay up front for the lease?
13     A.  Yes.
14     Q.  Do you know how much you paid?
15     A.  No.
16     Q.  Is there anything that would refresh your
17  recollection?
18     A.  Not to my knowledge.
19     Q.  Is this something that would have
20  appeared in your books?
21     A.  I'm not sure.
22     Q.  Do you have any recollection of the
23  percentage of the portfolio that you would have
24  paid?
25         MR. LITTLE:  Form.

Page 79
1
2      A.  I'm not going to answer that question but
3  the answer is no, I don't recall.
4      Q.  So you said that you did pay up front
5  rather than after collection or some other
6  arrangement?
7      A.  I believe so, yes.
8      Q.  What did you physically get from South
9  Western that permitted you to contact Ms. Perry?
10         MR. LITTLE:  Form.
11     A.  I don't understand the question.
12     Q.  What did you get from SouthWest Investors
13  Group, first of all –
14     A.  How did we get the information?
15     Q.  Yes, did you get an excel spreadsheet?
16     A.  Yes.
17     Q.  So everything that you got from them you
18  put into your system?
19     A.  Yes.
20     Q.  And everything that you have given to us
21  is everything that they gave to you and everything
22  that you have?
23     A.  To the best of my knowledge, yes.
24         (Whereupon, the aforementioned
25  document was marked as Plaintiff's

Page 80
1
2  Exhibit 8 for identification as of this
3  date by the Reporter.)
4      Q.  This is the initial responses to
5  discovery, have you seen this before today?
6      A.  I'm sure I have, again I am sure I have
7  but no specific review.
8      Q.  Same question again, did you verify these
9  responses?
10     A.  It looks like Mike Hyla did.
11     Q.  Did he confer with you at all when he was
12  verifying these?
13     A.  I don't recall.
14     Q.  When did you find out that Ms. Perry had
15  a lawyer and refused to pay these debts, without
16  making you read these responses into the record
17  again would you acknowledge that your responses were
18  when you were served with the complaint?
19     A.  Yes.
20     Q.  I am going to ask for request for
21  production 23 about the affirmative defenses, do you
22  agree in this matter that you are relying to support
23  your affirmative defenses and we can go back to
24  those because I don't think I specifically did that.
25  Let's go back to Exhibit 6 the file complaint in

Page 81
1
2  this matter in your affirmative defenses, I want to
3  confirm that they are the same.  I'm sorry its
4  Exhibit 7, can you acknowledge that these are the
5  same affirmative defenses as the Mullery complaint?
6      A.  Yes.
7      Q.  For request for production so we are back
8  on to Exhibit 8 request for production number 23.
9  Your evidence for your affirmative defenses are the
10  account notes that you produced for this account,
11  correct?
12     A.  Yes.
13     Q.  You haven't supplemented this?
14     A.  Not to my knowledge.
15     Q.  These are the account notes and it's a
16  little longer so it actually goes over 6 pages so I
17  see it says owned and serviced by us, correct?
18     A.  Yes.
19     Q.  Us being JTM?
20     A.  Yes.
21     Q.  Do you see anything on this page that
22  references the South West Investor Group?
23     A.  No.
24     Q.  I see a note here beamed out can you tell
25  me why that doesn't have a date and what that means?

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
Jacob Adamo on 05/20/2021                                    Pages 82..85

Page 82

1
2     A. It doesn't mean anything, that must have
3  been where the mouse was.
4     Q. So you were hovering on this page?
5     A. I wasn't.
6     Q. Whoever printed this?
7     A. Yes.
8     Q. So this box shows what is being hovered
9  over here, do you see anything that indicates that
10  Southwest Investors Group was involved?
11    A. No.
12    Q. On this page it says there was a legal
13  action that was placed on a different queue, can you
14  confirm the date on which that happened?
15    A. 10/26/2017.
16    Q. On 10/19/17 there are notes I can't quite
17  read that name.
18    A. It's just a user name, I believe it's
19  Leah Copansky.
20    Q. Who is that?
21    A. She worked for JTM for a month.
22    Q. Can you read the note and tell me what it
23  means?
24    A. I'm sorry which one?
25    Q. That says other.

Page 83

1
2     A. We were trying to put together some
3  payment for automatic work flows, nothing to do with
4  the consumer or the account.
5     Q. So you were changing the work flows what
6  does that mean?
7     A. I am not exactly sure what specifically
8  was happening at the time but I know that we were
9  trying for automation.
10    Q. What were you trying to automate?
11    A. Probably recall, again I don't want to
12  speculate I don't know at the time.
13    Q. There is a note here and I don't know
14  where the pictures are can you read this note on the
15  right?
16    A. Portfolio owners changed from UHG1.
17    Q. Can you see where this is on the account
18  notes?
19    A. He may not have -- it just means the
20  cursor is on it, it's in the notes if it's there it
21  should be in the notes.
22    Q. Who is R-O-S-A-N-D?
23    A. Consultant Andrea Rose, she is not an
24  employee.
25    Q. Where does she work?

Page 84

1
2     A. She works for herself, she is 1099.
3     Q. But she had access to JTM system?
4     A. On a contract basis.
5     Q. When was that contract?
6     A. During this timeframe towards the end of
7  2017.
8     Q. What does this note mean?
9     A. Systematically it got changed to UHG1, it
10  doesn't mean that we assigned to them but most
11  likely it's a systematic error due to the fact that
12  we were trying to do some things on a mass level so
13  it probably got caught up in there.
14    Q. And you can take as long as you want if
15  her mouse was on this screen, this screen is where
16  this information on the right should have come from
17  is that right?
18    A. Yes, it's probably there. I don't know
19  where it is but it should be there.
20    Q. Can you find it for me because I haven't
21  been able to find it?
22    A. It could be just on how the picture was
23  taken, I'll look for you but it may not be there.
24    Q. Let me know yes or no if it's there.
25    A. I don't think it's there.

Page 85

1
2     Q. Is it on this page?
3     A. I don't see it, no.
4     Q. Is it your testimony today that this
5  account was never changed to UHG?
6     A. Correct, yes it was not.
7     Q. And that's an error?
8     A. Yes.
9     Q. And UHG never owned this account?
10    A. Correct.
11    Q. I also see after that she was marked as
12  deceased and that's an error?
13    A. We were trying to do automation and it
14  was an error obviously.
15    Q. You talked about something being
16  systematic before and I apologize what were you
17  referring to being systematic?
18    A. I believe it was the change of portfolio
19  owner.
20    Q. That's just an error?
21    A. Yes.
22    Q. I have document 7 and the amount of the
23  debt on that date, so going back this is the first
24  page. Again we already looked at it can you
25  identify the date you obtained this debt?

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                                    Pages 86..89

Page 86

```
1
2      A. 7/30/2015.
3      Q. What about that tells you that you leased
4   that date?
5      A. It says in preview.
6      Q. Going to the address information can you
7   identify and you don't have to tell me the state but
8   the abbreviation for the state in which Ms. Perry
9   lives according to these notes?
10     A. South Carolina.
11     Q. There are two phone numbers here do
12  either of them start with 312?
13     A. I don't see anything.
14     Q. Now you testified that the spreadsheet
15  had been generated by your system?
16     A. Yes.
17     Q. Why was one line from a spreadsheet not
18  produced for Ms. Perry?
19     A. I don't recall.
20     Q. Could you have produced a spreadsheet
21  from Ms. Perry?
22     A. Yes, we could do the same export
23  specifically.
24        MS. ROBERTSON: I am going to ask
25     after this deposition that such a
```

Page 87

```
1
2     spreadsheet be produced.
3        MR. LITTLE: You can follow-up in
4     writing.
5      Q. Can you acknowledge that you have never
6   produced the lease agreements or any written
7   documentation of your ownership of this debt?
8      A. To the best of my knowledge I don't have
9   any of the documents.
10     Q. To the best of your knowledge does such a
11  document exist?
12     A. I don't know.
13     Q. Does JTM have policies regarding
14  documentation of leases?
15     A. No, not to my knowledge.
16     Q. Well you are the founder and president?
17     A. Correct but I don't memorize every
18  policy.
19     Q. Do you sign off on them?
20     A. When they are created.
21     Q. You have no proof that you paid for this
22  account?
23        MR. LITTLE: Form, other than his
24     testimony?
25     Q. Do you have proof that you paid for this
```

Page 88

```
1
2   account?
3        MR. LITTLE: Other than his
4     testimony?
5        MS. ROBERTSON: Yes.
6      Q. Other than your testimony do you have
7   proof that you paid for this account?
8      A. Not to my knowledge.
9      Q. Have you looked for proof that you paid
10  for this account?
11     A. I believe we did at a certain point and I
12  could not find the document.
13     Q. Do you recall what you did to try to find
14  it?
15     A. No, I know that we were looking for it
16  though.
17     Q. I am going to see if I can refresh your
18  recollection, this is the same thing that happened
19  in the Mullery matter. We move to compel response
20  to a request and if I can go back to our document
21  production request number 6, I am not going to force
22  you to read the question and the response out loud
23  but if you can carefully read it to yourself and let
24  me know when you are done?
25     A. Done.
```

Page 89

```
1
2      Q. Would you agree that this requests any
3   asset purchase agreement, flow agreements,
4   assignment, signed account agreements or any
5   evidence that would show that you owned the debt?
6        MR. LITTLE: Objection to form,
7     that's not what it says you can answer if
8     you know.
9      A. I understand what the request is and I
10  understand what our response was.
11     Q. So you objected and like the Mullery case
12  you also said that you were withholding any
13  information responsive?
14     A. Yes, that's what it says yes.
15     Q. And then you said that you don't have any
16  correspondence from Ms. Perry or her attorneys,
17  correct?
18     A. Correct.
19     Q. Similar to the Mullery matter we move to
20  compel, JTM's counsel responded and you supplemented
21  your discovery?
22        (Whereupon, the aforementioned
23     document was marked as Plaintiff's
24     Exhibit 9 for identification as of this
25     date by the Reporter.)
```

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                                        Pages 90..93

Page 90

1
2      Q.  I am not going to make you read this out
3  loud because it is identical to the response in the
4  Mullery matter but if you can read it to yourself
5  and confirm when you are done?
6      A.  I read it.
7      Q.  Would you agree that you raised the same
8  objections and you said that other than what is
9  attached to the complaints that you don't have any
10 correspondence?
11     A.  Correct.
12     Q.  And you objected on a few basis and just
13 to refresh your recollection these were produced in
14 May of 2020 so almost a year ago.  At this time did
15 you search for any evidence of the lease?
16     A.  Yes.
17     Q.  That's when you searched for the evidence
18 of the lease?
19     A.  Yes, when it was requested again and we
20 were compelled to provide we looked for it and it
21 didn't exist.
22     Q.  I know that it's been a year but what did
23 you do to try to find it?
24     A.  Generally looked for it through file
25 cabinets and things of that nature, that's what you

Page 91

1
2  do when you look for a document.
3      Q.  Did you call anyone from SouthWest
4  Investors Group?
5      A.  I did not, at this point they were in
6  bankruptcy.
7      Q.  Did you call anyone that formerly worked
8  for Southwest Investors Group?
9      A.  I did not.
10     Q.  Bankruptcy trustee?
11     A.  No.
12     Q.  Did you look online?
13     A.  No.
14     Q.  Did you look on your computer systems?
15     A.  Yes, I did I looked on my computer.
16     Q.  So did you look in the Beam program?
17     A.  It would not be in Beam.
18     Q.  If it was in your system where would it
19 have been?
20     A.  It would have been in my personal
21 computer that I work out of in a folder for
22 contracts.
23     Q.  Do you have back up for that computer?
24     A.  We do not, it's my personal computer.
25     Q.  Is that where you store most of the

Page 92

1
2  leases and contracts?
3      A.  From JTM, yes.
4      Q.  No policies regarding tape, backups,
5  cloud backups?
6      A.  I'm not sure currently but at that time
7  specifically no, particularly when these agreements
8  were made.
9      Q.  Have you ever had a dispute with someone
10 that you had a lease with or someone that you had a
11 joint venture with?
12     A.  Yes.
13     Q.  And if you have not documented your lease
14 or your joint venture how do you resolve these
15 disputes?
16     A.  You try to work it out amicably and you
17 know usually you do.  Usually the issues are minute
18 enough to where you work it out.
19     Q.  What if they aren't?
20     A.  Litigation.
21        MR. LITTLE:  Outside the scope
22 objection, you can answer if you know.
23     Q.  Do you have leases drafted by counsel?
24     A.  For what this in particular?
25     Q.  Sure.

Page 93

1
2      A.  No, not to my knowledge.
3        (Whereupon, the aforementioned
4     document was marked as Plaintiff's
5     Exhibit 10 for identification as of this
6     date by the Reporter.)
7      Q.  This is a stipulation have you seen this
8  before today?
9      A.  Yes.
10     Q.  Can you describe what it says?
11     A.  I mean my understanding is most of JTM's
12 revenues derive from outsourcing two agencies.
13     Q.  And those collection agencies collect
14 default and consumer debts?
15        MR. LITTLE:  Form.
16     A.  Yes.
17     Q.  And you acknowledge that it says 95
18 percent revenue came from that business during 2017
19 and 2018 and the stipulation is for this matter,
20 only these two matters, correct?
21     A.  To my understanding, yes.
22     Q.  You said that a small portion of JTM's
23 business constituted consulting I think is the way
24 that we ended up summarizing, would you say that's
25 the other five percent?

**THERESA MULLERY vs JTM CAPITAL MANAGEMENT, LLC**
**Jacob Adamo on 05/20/2021**                                    **Pages 94..97**

Page 94

1
2        MR. LITTLE:  Form.
3        A.  It's hard for me to say what the other
4    five percent is without me looking.
5        Q.  Well earlier in this deposition you
6    stated that the outsource collection of defaulted
7    receivables not sure of the exact term that you used
8    was most of your revenue, correct?
9        A.  Yes.
10       Q.  And you said that the rest of your
11   revenue would have been from what we described as
12   consulting, correct?
13       MR. LITTLE:  Objection to form, he
14   said passive investments and consulting.
15       MS. ROBERTSON:  Thank you for the
16   clarification.
17       Q.  Are those separate things passive
18   investing and consulting?
19       A.  Yes.
20       Q.  What is a passive investment?
21       A.  Investment in anything, in a business you
22   know you buy and sell accounts for that it could be
23   anything.
24       Q.  So when we were talking about investments
25   though we are not talking about real estate holdings

Page 95

1
2    or antiques you are talking about defaulted consumer
3    debts or are you talking about something else?
4        A.  Not necessarily, again JTM is a single
5    member LLC so you know it could just be a tax
6    position, it could be a multitude of different
7    things.
8        Q.  Can you give me an example of something
9    that you invested in that would fit that
10   description?
11       A.  I'm not sure why this is relevant to be
12   honest with you.
13       Q.  I'm trying to understand what you mean by
14   passive investment?
15       A.  When I take on a position where most of
16   JTM's core business is buying and placing accounts
17   so that's the stipulation, that 95 percent of its
18   revenue was derived from outsourcing to third party
19   collection agencies.
20       Q.  The other five percent we are not sure on
21   but 95 percent of were?
22       (Continued on next page to include
23   jurat.)
24
25

Page 96

1
2    A.  Correct.
3        MR. LITTLE:  I reserve his right to
4    read and sign as set forth in the rules
5    and would like a PDF please.
6        (Whereupon, at 1:20 P.M., the
7    Examination of this Witness was
8    concluded.)
9
10
     _____
11       JACOB ADAMO
12   Subscribed and sworn to before me this
     _____ day of _____, 2021.
13
     _____
14   NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25

Page 97

1
2            C E R T I F I C A T E
3
     STATE OF NEW YORK       )
4                            ) ss:
     COUNTY OF NEW YORK   )
5
6        I, STACY ADAMES, a Shorthand Reporter
7    and Notary Public within and for the State of
8    New York, do hereby certify:
9        That JACOB ADAMO, the witness whose
10   EXAMINATION BEFORE TRIAL was held on May 20,
11   2021, as hereinbefore set forth, was duly
12   sworn by me, and that this transcript of such
13   Examination is a true and accurate record of
14   the testimony given by such witness, to the
15   best of my ability.
16       I further certify that I am not related
17   to any of the parties to this action by blood
18   or by marriage, and that I am in no way
19   interested in the outcome of this matter.
20       IN WITNESS WHEREOF, I have hereunto set
21   my hand this 20th day of May, 2021.
22
23
     _____
24
     STACY ADAMES
25